**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0371n.06
Filed: June 25, 2008

**No. 06-6059**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NANCY H. ROBERTS, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| ANTHONY J. PRINCIPI, Secretary of U.S. | ) | **O P I N I O N** |
| Department of Veterans Affairs, U.S. DEPARTMENT | ) | |
| OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE:** **ROGERS, COOK, and McKEAGUE, Circuit Judges.**

**McKEAGUE, Circuit Judge.** Nancy H. Roberts sued her employer, the United States

Department of Veterans Affairs ("VA"), alleging various federal claims, including retaliation under

Title VII of the Civil Rights Act of 1964. After holding a bench trial, the district court found that

Roberts had failed to establish a causal connection between her protected activity and any adverse

acts of the VA. The district court dismissed her retaliation claim.

On appeal, Roberts argues that the retaliatory animus of her coworkers should be imputed

to the ultimate decisionmaker, who Roberts concedes did not otherwise hold any retaliatory

animosity towards her. Because the decisionmaker engaged in an independent investigation,

however, we reject Roberts's imputation argument and affirm the judgment of the district court.

**I**

The district court's findings of fact are located at pages 2-12 of its written opinion following the bench trial. *Roberts v. Principi*, No. 2:02-CV-166 (E.D. Tenn. June 16, 2006). We summarize the pertinent facts on appeal:

Roberts, a Caucasian female, was fifty-three years old when she sued. The James H. Quillen Veterans Affairs Medical Center ("VAMC") in Johnson City, Tennessee, employed Roberts as a Certified Registered Nurse Anesthetist ("CRNA"). From the time of her appointment in 1996 through the end of June 2001, Roberts served in the anesthesia section of the VAMC's surgical service. Each operating room was staffed by a single CRNA assigned by the anesthesia section and at least two registered nurses assigned by the nursing service. CRNAs administered anesthesia under the oversight of an anesthesiologist.

The anesthesia section included six CRNAs and one licensed practical nurse. During the relevant period, the CRNAs were, in order of seniority: Wanda Ibrahim, Carolyn Harris, Roberts, Rachel Weston, Ruben Fuentes, and Cathy Jo Hunt. Ibrahim had been designated lead CRNA for many years and performed most of the administrative functions attendant to that position. Dr. Clarence Goulding supervised the surgical service, including the anesthesia section. Dr. Goulding reported to Dr. Louis Cancellaro, the Medical Chief of Staff. The registered nurses and licensed practical nurses reported to Juan Morales, R.N. Dr. Cancellaro and R.N. Morales reported directly to Dr. Carl Gerber, Director of the VAMC.

In January 2001, Fuentes directed profane, vulgar, and gender-oriented comments at Roberts and some of the other CRNAs. Roberts complained to Dr. Goulding about Fuentes's comments, to

no avail. On January 29, 2001, Roberts contacted a VA Equal Employment Opportunity ("EEO") counselor and complained about Fuentes's actions and Dr. Goulding's lack of response to her complaints. At the suggestion of the EEO counselor, Roberts took her complaints to Dr. Theron T. Knight, Jr., the VAMC Chief of Surgery. Dr. Knight assured Roberts that he would talk with Fuentes and Lori Hagen, Nurse Supervisor, who Roberts also alleged had made hostile and retaliatory remarks toward her.

Shortly after Roberts spoke with Dr. Knight, Hagen followed her down a hallway and accosted her, something Hagen denied at trial. About the same time, Roberts received a note she alleged came from Fuentes. The note contained vulgar and derogatory comments, which Roberts believed were directed at her. Roberts filed a formal complaint of discrimination with the VA alleging that Hagen and Fuentes had discriminated against her and that Dr. Goulding and Dr. Knight failed to take corrective action.

On June 11, 2001, an EEO investigator called and interviewed Hagen concerning Roberts's EEO charge. The next morning, Hagen told her nursing staff that Roberts had filed an EEO charge against her and that she was resigning her position in the operating room because of Roberts. Hagen later admitted, however, that she had already been interviewed and selected for the Patient Safety Officer position at the VAMC and had planned to transfer to that position because she was burned out in the operating room. Hagen did not disclose this information to her staff but rather blamed her resignation on Roberts's EEO complaint.

After learning of the complaint and Hagen's transfer to another position, various operating-room staff began to circulate three separate petitions against Roberts. R.N. Stephanie

Story drafted one of the petitions; twenty-five other members of the operating-room staff signed the petition. Their petition accused Roberts of "inappropriate and intimidating behavior" toward a coworker and of generally creating discord in the operating room. It did not mention any complaints or EEO charges filed by Roberts. Weston drafted the second petition, which she signed along with Ibrahim, Fuentes, and Hunt. It alleged that Roberts "has filed numerous complaints which have no basis in reality." It further asserted that Roberts "does retaliate, confabulate, and intimidate to obtain her goals." Dr. Julie Dunn, a surgeon and professor at the East Tennessee University College of Medicine, drafted the final petition, which she signed along with eleven other VAMC surgeons. The surgeons' petition mentioned "a complaint . . . filed against Ms. Lori Hagen" and lamented "the continual harassment that Hagen and others have had to endure . . . to the detriment of the Surgical Service." It asked that the VA investigate not only Roberts's complaint, but also investigate Roberts "for further insight into the REAL source of the problem." Hagen did not draft or sign a petition.

The petitions were forwarded to Dr. Gerber, who gave them to Dr. Cancellaro for his review and action. At the time Dr. Gerber forwarded the petitions to Dr. Cancellaro, Dr. Gerber was aware of Roberts's pending EEO charges. He did not, however, inform Dr. Cancellaro of the EEO activity.

Dr. Cancellaro immediately realized that the VAMC had a potentially serious problem which threatened patient care. Dr. Cancellaro was particularly concerned about the petition signed by the VAMC surgeons. Fearing that the disruption in the operating room directly affected patient care, Dr. Cancellaro summoned Roberts, whom he did not know, to his office on June 27, 2001, and informed her that he had received complaints against her and that he was removing her temporarily from the anesthesia section and detailing her to the VAMC's emergency room as a staff nurse. Dr.

Cancellaro felt that he could not wait for a formal investigation because of the potential impact on patient care threatened by the discord in the operating room.

The VAMC commissioned a factfinding board to investigate the matter. The board interviewed Roberts along with thirteen of her coworkers. The board issued its final report on July 18, 2001. It found, among other things, that Roberts had a short temper that sometimes was exhibited in front of patients, was demeaning to nurses, and, as a result of her "attitude, behavior and lack of respect of her coworkers," "created an atmosphere of fear and intimidation in the surgical work area." FFB Rep. at 3-4. The board concluded that the allegations made in the petitions were true and recommended that "under no conditions should [Roberts] be returned to the operating room." *Id.* at 5.

Because he considered a permanent transfer a drastic action, Dr. Cancellaro wanted a more formalized review of the issues involving Roberts. The VAMC authorized an Administrative Board of Inquiry ("ABI") comprised of employees from other VA facilities to hear sworn testimony concerning the matter. The ABI took sworn testimony or declarations from twenty-nine people (including Roberts and witnesses she suggested) and reviewed various documents dating from 1999 to 2002. At the conclusion of its investigation, the ABI issued a formal written report on May 16, 2002. The ABI's findings were similar to those of the earlier factfinding board: Roberts's behavior and relationships with most of her coworkers contributed to "a very stressful working environment"; she was hostile and disrespectful to anyone who had an authority role; and putting Roberts back into the surgical service would "recreate the very dysfunctional environment, possibly at an elevated state." ABI Rep. at 3-5. The ABI concluded, "[T]he reappointment of Ms. Roberts to the anesthesia

service would be detrimental to the James H. Quillen VA Medical Center Surgery Program as many surgeons would reportedly resign and patient care could be compromised through the many distractions this would cause." *Id.* at 6.

Based on the findings and recommendations of the ABI, Dr. Cancellaro permanently reassigned Roberts to the VAMC's GI lab in August 2002. According to Dr. Cancellaro, the ABI findings were sufficient to warrant permanent reassignment; he denied having any retaliatory motive. Roberts's pay and benefits remained the same after the transfer, although she did lose the opportunity for certain overtime pay and was working in a position that did not permit her to use her CRNA skills to the same extent. Roberts remained in the GI lab until it was consolidated with surgical services in July 2005. Roberts was later assigned to the VAMC's bronchoscopy lab.

Roberts's transfer spawned two separate lawsuits. In June 2002, Roberts sued the Secretary and the VA in the Eastern District of Tennessee. She alleged discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), retaliation for engaging in activity protected under Title VII, and violation of the Freedom of Information Act ("FOIA").

In November 2002, Roberts sued five of her coworkers in state court. The Government removed the suit to federal district court. On the Government's certification and motion, the district court substituted the Government as the defendant and dismissed the action for lack of subject-matter jurisdiction pursuant to the Westfall Act. A panel of this court affirmed on appeal. *Roberts v. United States*, 191 F. App'x 338 (6th Cir.), *cert. denied*, 127 S. Ct. 683 (2006).

As to her suit against the Secretary and the VA, Roberts abandoned her ADEA claim while the defendants conceded an inadvertent violation of FOIA. The district court held a two-day bench trial on her Title VII retaliation claim.

The district court heard testimony from Roberts's coworkers that, while her professional performance as a CRNA was generally adequate (except as recounted by Dr. Janet Brown, *see infra*), her interpersonal relationships were poor. For quite some time, Roberts had been a source of discontent within the operating room. Hagen testified that Roberts had harassed her for about two years prior to the filing of the EEO complaint, constantly made complaints to her supervisors, and sought favoritism through the inappropriate giving of gifts.

Roberts displayed problems with anger management, something the factfinding board cited in support of its recommendation. Both Weston and Ibrahim testified at trial that Roberts had problems getting along with others and would not cooperate with the group. According to Weston, Roberts exhibited repeated outbursts of anger and chronic temper tantrums since her assignment to the operating room. Ibrahim experienced a host of conflicts with Roberts. Roberts made numerous complaints against Ibrahim and complained about her room assignments and holiday duty. Roberts was absent from the department for long periods of time which led to anger and resentment by other CRNAs. In short, Roberts was demanding, disruptive, and irrational, according to several of her fellow CRNAs.

Carol Dubay, a registered nurse, testified that the operating room was a high stress, fast-paced place. According to Dubay, Roberts caused significant stress in the operating room and would become angry, slam doors, and throw things. Dubay testified that she did not want to work with

Roberts. According to Dubay, the atmosphere in the operating room improved considerably after Roberts left.

Dr. Dunn testified that she drafted the surgeons' petition without request by or input from Hagen. While she acknowledged that she had not personally seen any detrimental patient impact attributable to Roberts, she testified that she would not have continued to allow her patients to be placed under Roberts's care. Roberts disrupted the operating room, caused morale problems, and created stress in the operating room that was counterproductive to patient care. Morale and work flow improved after Roberts left the operating room, in Dunn's opinion.

In the view of the district court, the most damning testimony about Roberts's performance came from Dr. Janet Brown, an ophthalmologic surgeon at the VAMC. Dr. Brown, an assistant professor at the East Tennessee University College of Medicine for ten years, had performed surgery at VAMC for nineteen years. Dr. Brown performed cataract surgery using topical anesthesia applied with the patient awake. As recounted in the ABI report and reiterated during trial, Dr. Brown testified that Roberts did not adequately sedate several of her patients, which resulted in complications. She testified that Roberts was unwilling to communicate with the doctor or comply with her requests. Roberts's actions increased patient risk, discomfort, and stress. Dr. Brown reported Roberts's inadequate job performance to Dr. Goulding but there was no change in Roberts's performance. Dr. Brown testified that she would never allow Roberts to work with her again. The district court found Dr. Brown to be a wholly credible witness.

Roberts disputed much of her coworkers' testimony. She rejected the notion that she created the discord in the operating room. Rather, she placed the blame primarily on Hagen and Fuentes.

She also pointed out the positive performance appraisals she received since leaving the operating room.

After the close of proofs, the district court took the case under advisement. The district court subsequently issued a written opinion and judgment dismissing Roberts's retaliation claim for lack of a causal connection between any retaliatory motives of her coworkers and Dr. Cancellaro's decision to transfer her to another department. The district court determined Roberts had "created disruption and disharmony in the operating room," "had great difficulty getting along with others," and "more importantly, that she refused direct physician directives in dealing with patient sedation." *Roberts*, D. Ct. Op. at 15. The district court found that, together, these problems "had a clear potential for significant, detrimental impact on patient care at VAMC." *Id.* It was this potential impact on patient care, rather than retaliatory animus, that caused her transfer, according to the district court. *Id.* at 19-20. The district court also denied Roberts's claim of attorneys' fees in connection with the FOIA violation. *Id.* at 25.

Roberts appealed.[1]

**II**

**A.      Standard of Review**

---

[1]On appeal, Roberts focuses entirely on her Title VII retaliation claim. Accordingly, she has abandoned any appeal as to her claim for attorneys' fees under FOIA. *Renkel v. United States*, 456 F.3d 640, 642 n.1 (6th Cir. 2006).

The district court issued findings of fact and conclusions of law after the bench trial. Under Federal Rule of Civil Procedure 52, we "must not . . . set aside" the findings of fact "unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). We must also "give due regard to the trial court's opportunity to judge the witnesses' credibility." *Id.* "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) (internal citations omitted). As for the district court's legal conclusions, we review these de novo. *Pressman v. Franklin Nat'l Bank*, 384 F.3d 182, 185 (6th Cir. 2004).

When reviewing the judgment of a district court after a bench trial, we do not analyze the plaintiff's claim under the burden-shifting paradigm of *McDonnell-Burdine*, but instead focus on the "ultimate question" of discriminatory retaliation. *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). As the Supreme Court has explained,

> [W]hen the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the *McDonnell-Burdine* presumption drops from the case, and the factual inquiry proceeds to a new level of specificity.

*U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714-15 (1983) (internal citations and quotation marks omitted). Moreover, whereas at the summary judgment stage, a plaintiff need only come forth with something more than a scintilla of evidence to show that a genuine issue of fact

exists, at the trial stage, the plaintiff must prove every element of her claim by a preponderance of the evidence. *See Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007).

## B.     Retaliation

### 1.     Section 704(a)

Section 704(a) of Title VII prohibits retaliation by covered employers for two types of activity, opposition and participation:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To succeed on a claim of retaliation, the plaintiff must prove that she engaged in protected activity; that her employer knew she engaged in protected activity; that her employer took materially adverse action against her; and, finally, that her employer took the action because she engaged in protected activity. *See id.*; *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006).  The district court held that Roberts's claim failed at the causation stage.

### 2.     Causation

Roberts had to prove that the animus created by her protected activity caused the VA to transfer her.  She concedes that the ultimate decisionmaker—Dr. Cancellaro—did not harbor any

retaliatory animosity toward her.[2]  It is also undisputed that patient care is a primary concern for the

VAMC and that the VAMC has the authority and obligation to deploy employees and assets in a

manner that optimizes such care.  Roberts does not take issue with these contentions, but instead

argues that patient care was not the motivating factor for her transfer.  Rather, she argues that the

retaliatory animus of Hagen and her supporters so influenced Dr. Cancellaro's decision that their

animus should be imputed to him.  He was, according to Roberts, a mere (but effective) conduit in

their efforts to retaliate against her.

The record is clear that Hagen and at least some of the petition signatories acted against

Roberts because of her EEO activity.  Hagen knew of the EEO charge against her and told her

nurses, who then drafted and signed one of the petitions.  The surgeons' and CRNAs' petitions

specifically mention Roberts's "complaint," although neither states that the complaint was an EEO

charge.  Without Hagen's outburst after being informed of the EEO charge, it is unlikely that the

three petitions would have been given to Dr. Cancellaro in June 2001.

Yet, as noted by the district court, the discriminatory or retaliatory animus of a coworker is

not usually relevant to whether the employer violated Title VII.  Rather, the relevant beliefs or

motivations are those of the actual decisionmaker, usually a supervisor or manager.  *Bush v.

Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) ("[S]tatements by nondecisionmakers, or

statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the

---

[2]Although Roberts suggests at various places in her briefs that Dr. Gerber was also a decisionmaker, the district court focused on Dr. Cancellaro as the actual decisionmaker.  As the record demonstrates, Dr. Gerber delegated to Dr. Cancellaro the responsibility for determining whether to transfer Roberts, although Dr. Gerber did sign off on her permanent transfer.

plaintiff's burden . . . of demonstrating animus." (internal quotation marks omitted)); *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990) ("[A] statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."); *cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986) (concluding that Congress "evince[d] an intent to place some limits on the acts of employees for which employers . . . are to be held responsible" under Title VII). Whether some of Roberts's coworkers reacted to her EEO activity is of little consequence if they did not, in some sense, cause her transfer.

Roberts attempts to show exactly that—her coworkers, fueled by Hagen's outburst, drafted three inflammatory petitions, which influenced Dr. Cancellaro so strongly that it can be said that her coworkers caused her transfer. Dr. Cancellaro's testimony confirms that he relied principally, if not solely, on the petitions when he decided to transfer Roberts temporarily to the emergency room. Roberts does not, however, claim in her briefs that this temporary transfer, in and of itself, constituted a violation of Title VII. Rather, she focuses on whether her permanent reassignment was made in retaliation for her EEO activity. This is the issue that the district court considered, *see Roberts*, D. Ct. Op. at 14, and Roberts does not raise any claim of error on appeal as to the scope of the district court's analysis.[3]

---

[3]At oral argument, plaintiff's counsel stated that the initial transfer was itself a separate claim for relief. Because counsel raised the issue only at oral argument, however, we decline to review it. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 714 (6th Cir. 2001) (explaining that the court of appeals will "not reward quick-thinking counsel by entertaining grounds brought to [the court's] attention for the first time at oral argument").

Had Dr. Cancellaro made his decision to transfer Roberts permanently based solely on the three petitions, Roberts would have a strong argument that Dr. Cancellaro was nothing more than a conduit or a "cat's paw" of her coworkers' retaliatory animosity. "In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006), *cert. dismissed*, 127 S. Ct. 1931 (2007); *see also Arendale v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008) ("When an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability.").[4]

Under this theory, the subordinate, not the nominal decisionmaker, is the driving force behind the employment action. When a decisionmaker acts in accordance with a retaliator's bias "without [him]self evaluating the employee's situation," the retaliator "clearly causes the tangible employment action, regardless of which individual actually" enforces the adverse transfer or termination.

---

[4]The Tenth Circuit described the origin of the term "cat's paw" as follows:

> The "cat's paw" doctrine derives its name from a fable, made famous by La Fontaine, in which a monkey convinces an unwitting cat to pull chestnuts from a hot fire. As the cat scoops the chestnuts from the fire one by one, burning his paw in the process, the monkey eagerly gobbles them up, leaving none for the cat. Today the term "cat's paw" refers to one used by another to accomplish his purposes.

*BCI Coca-Cola*, 450 F.3d at 484 (internal quotation marks and citations omitted).

*Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998) (citations omitted). "In effect, the [retaliator] *is* the decisionmaker, and the titular 'decisionmaker' is a mere conduit for the [retaliator's] discriminatory animus." *Id.* (emphasis in original). Imposing liability on the employer in this context is in accord with the agency principles and policies underlying Title VII. *BCI Coca-Cola*, 450 F.3d at 485-86.

However, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed. *Wilson v. Stroh Cos.*, 952 F.2d 942, 946 (6th Cir. 1992); *see also BCI Coca-Cola*, 450 F.3d at 485 (explaining that "a plaintiff could not prevail because the decisionmaker had conducted an independent investigation of the facts, rather than relying entirely on the recommendation of the biased subordinate"); *Lacks v. Ferguson Reorganized Sch. Dist. R-2*, 147 F.3d 718, 725 (8th Cir. 1998) (affirming summary judgment for employer school district because the board had engaged in an independent investigation rather than rely simply on the desires of school administrators). By making a decision based on an independent investigation, the decisionmaker confirms that he is acting as a true agent of the employer and not a mere conduit of the subordinate. The question becomes, then, whether the investigation here was an independent one or merely a façade. *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990).

Dr. Cancellaro did not himself investigate the factual assertions made in the petitions, but neither did he uncritically accept them as true. Instead, he first appointed an internal factfinding board and then, wanting a more thorough examination, appointed an external board with the power to take sworn testimony. The ABI alone took sworn testimony or statements from almost thirty

persons, including Roberts. These investigations were more extensive than ones found adequate by this and other courts to break any causal link between a coworker's animosity and an adverse action. *Wilson*, 952 F.2d at 944, 946 (affirming summary judgment in favor of the employer, the Sixth Circuit found that a manager's discussion with one witness was sufficient for the investigation to be independent); *see also Llampallas*, 163 F.3d at 1249 (finding that a meeting between a supervisor and the plaintiff was sufficient "to except this case from the cat's paw line of cases"); *Lacks*, 147 F.3d at 725 (concluding that the school board's investigation, consisting of hearing testimony from the plaintiff and fifteen other witnesses, reviewing various documents, and watching a videotape, was sufficient for the investigation to be deemed independent).

Even if some of the witnesses who testified before the ABI had a hidden agenda, that alone is not sufficient to compel a finding that the agenda caused the adverse action. Where the employer's decisionmaker tries to get all sides of the story, the employer will not be held liable solely because one side might harbor a hidden bias against the plaintiff employee. *See Llampallas*, 163 F.3d at 1250. As the Tenth Circuit explained, "[S]imply asking an employee for his version of events may defeat the inference that an employment decision was . . . discriminatory." *BCI Coca-Cola*, 450 F.3d at 488 (emphasis added).

The Ninth Circuit, however, appears to apply a more lenient standard for establishing causation. In *Poland*, that court held:

> [I]f a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually

independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

494 F.3d at 1182. A broad reading of this holding would impose employer liability whenever a biased subordinate "influence[s]" an investigation by, for example, talking with the investigator, giving the investigator a list of possible witnesses, or otherwise forwarding information to the investigator.[5] Yet, it is hard to fathom in practical terms how an investigator can know ahead of time that a particular subordinate harbors discriminatory or retaliatory animosity against the employee. Typically, it will only be with the benefit of 20/20 hindsight that the animosity will become clear. As long as the decisionmaker seeks input from all sides of the dispute (most importantly from the targeted employee) and as long as the decisionmaker does not permit a subordinate's biased view to become the overriding influence, then the resulting decision will be an independent one.

Roberts understandably wants us to focus on the petitions. Yet, those petitions were largely, if not wholly, irrelevant to Dr. Cancellaro when he made his final decision. As he recounted during trial, "It's not sufficient just to sign a piece of paper . . . ." Trial Tr. at 375. Rather, it was the ABI's report upon which he based his final decision. The ABI report made clear that the problems with Roberts predated Hagen's outburst about the EEO charges and the subsequent petitions. This message was reinforced at trial. Several of the witnesses testified that their problems with Roberts were caused by her longstanding intimidation, hostility, and passive-aggressive personality. While

---

[5]*Poland* is also factually distinguishable from the present case. The subordinate's influence on the investigation in *Poland* was much more extensive than was Hagen's. *See Poland*, 494 F.3d at 1178. Moreover, the investigative panel did not ask Poland to identify witnesses on his own behalf. *Id.*

- 17 -

several of the witnesses knew about Roberts's EEO charges before they complained about her to management, some asserted that they did not, including Dr. Brown whose testimony was fully credited by the district court.

Roberts also points to certain statements made by the ABI to support her position that there was no valid justification for transferring her. While noting some of the performance issues identified by several of the witnesses, the ABI concluded that there was "nothing concrete and substantial" upon which to base a transfer out of the operating room. ABI Rep. at 6. Moreover, the ABI could "find no regulations or actions that could support the revocation of Ms. Roberts'[s] privileges as a CRNA." *Id.* Roberts argues that these statements, along with her positive performance reviews since leaving the operating room and the trial testimony of Dr. James Battle, who testified that he had no problems with Roberts's professional performance, confirm that the VA could "not legally justify, or cause," her permanent transfer. Appellant's Reply Br. at 11.

Roberts conflates legal justification with causation. In any event, what Roberts largely ignores is the ABI's conclusion that Roberts's *personality* caused considerable discord within the operating room. The ABI went so far as to predict that her "return [to the surgical service] would likely cause the downfall of Mountain Home's surgical program." ABI Rep. at 5. In the ABI's words, Roberts's reentry into the operating room "could certainly impact patient care" in a negative way. *Id.*

Whether the ABI could identify a particular VA regulation to support the reassignment did not bind Dr. Cancellaro. Personality conflicts can cause a group to become dysfunctional, and a dysfunctional group working in an operating room can increase the risk of patient injury or death,

regardless of the technical skills of each individual doctor or nurse. Dr. Cancellaro had the discretion to reassign VAMC assets, including employees, to further the VAMC's goal of patient care. As long as his decision was based on that permissible goal, rather than an impermissible, retaliatory motive, he could transfer her without violating Title VII.

Roberts is correct that the ABI did not place the entire blame on her. Dr. Goulding's supervision was, to say the least, lax. There appears to have been few effective controls over or documentation of personnel issues. Moreover, Roberts was never even given copies of the petitions until after she filed this lawsuit. Others in the operating room reciprocated Roberts's ill-treatment without much, if any, intervention by supervisors. Stronger management in the operating room might have been able to defuse the problems earlier. With that said, it is clear that Roberts was a fountainhead of discord in the operating room; after her removal, the operating room settled and everyone began working as a team.

While Roberts does have some record evidence—primarily her testimony and the three petitions—to support the inference that Dr. Cancellaro acted as a mere conduit of her coworker's retaliatory animus, she has failed to marshal sufficient evidence to compel that factual finding. Accordingly, under the deference afforded to the district court's factual findings, we conclude that the district court did not clearly err in finding that Roberts failed to establish that her permanent transfer was caused by any retaliatory animus of her employer.

## III

For the reasons set forth above, we AFFIRM the judgment in favor of the defendants.