NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0566n.06

No. 10-3806

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jun 01, 2012**

LEONARD GREEN, Clerk

JOSE DAVIS,                                                 :
                                                           :
        Plaintiff-Appellant,                               :
                                                           :        **ON APPEAL FROM THE**
v.                                                         :        **UNITED STATES DISTRICT**
                                                           :        **COURT FOR THE NORTHERN**
                                                           :        **DISTRICT OF OHIO**
OMNI-CARE, INC.,                                           :
                                                           :        **OPINION**
        Defendant-Appellee.                                :


**BEFORE: BOGGS and WHITE, Circuit Judges; BERTELSMAN, District Judge.**[*]


PER CURIAM. Plaintiff-Appellant, Jose Davis ("Davis"), appeals the district court's grant

of summary judgment in favor of his former employer, Defendant-Appellee Omni-Care, Inc.

("Omni-Care"), on his claim of retaliation pursuant to Title VII of the Civil Rights Act of 1964 *et*

*seq.* ("Title VII") and Ohio Revised Code Section 4112.01 *et seq*.

Because the district court properly concluded that Davis failed to demonstrate that Omni-

Care's legitimate, non-discriminatory reason for terminating him was pretextual, we AFFIRM.

I.

Davis, an African-American male, is a former employee of Omni-Care. Omni-Care is a

leading provider of pharmaceutical care to the elderly, as well as a provider of professional

---

[*]The Honorable William O. Bertelsman, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

pharmacy and related consulting and data management services for skilled nursing, assisted living and other institutional healthcare providers. (R. 30-1, Calhoun Decl., at ¶¶ 3, 5).

During his employment with Omni-Care, Davis worked as a driver technician, delivering pharmaceuticals and medical supplies to both private consumers and medical service providers. (R. 31-1, Davis Depo., at 31). Davis reported directly to Joe Havrilla ("Havrilla"), the Distribution Manager, who reported to the facility General Manager, Dana Iacovetta ("Iacovetta"). (R. 30-5, Havrilla Decl., at ¶¶ 3-4); (R. 30-3, Iacovetta Decl., at ¶¶ 2-3). Davis received his route information at the beginning of each day from his router, although deliveries were typically supplemented throughout the day. (R. 31-1, Davis Depo, at 123).

In January 2008, Davis noticed what he perceived to be a noose hanging on a co-worker's bulletin board. (R. 32-1, Davis Aff., at ¶ 3). The noose was a piece of string, approximately six inches in length, which was tied in a slip knot with a loop on the end. (R. 30-3, Iacovetta Decl., at ¶ 9).[1] Davis interpreted the noose as a sign of racial animosity and was offended. (R. 32-1, Davis Aff., at ¶ 4). The first day that he noticed the noose, he verbally complained to the router who sat nearby, and that individual instructed Davis to speak with the person who put it up. (*Id*. at ¶ 6).

On January 31, 2008, Davis wrote a letter formally complaining about the noose. (R. 31-1, Davis Depo., at 139-40). He provided this letter to several of the facility managers, but did not give it to Havrilla. (*Id*. at 140). Iacovetta received a copy of the letter, and she immediately removed the

---

[1] The "noose" belonged to Tom Butler, a co-worker of Davis. (R. 31-1, Davis Depo., at 129-30, 149). Butler stated that he used this string as a way to relieve stress. (R. 30, Plaintiff's Ex. D, Statement of Tom Butler).

noose from where it was hanging and informed Davis that she had "handled it." (R. 30-3, Iacovetta Decl., at ¶¶ 6-8); (R. 32-1, Davis Aff., at ¶ 8).

Iacovetta also alerted her supervisor, Area Director Gloria Calhoun Lewis ("Calhoun"), and the facility Human Resources representative, Tom Masters ("Masters"), as to what had occurred. (R. 30-3, Iacovetta Decl., at ¶ 10). They discussed the situation, as well as how to respond further. (*Id*. at ¶ 11); (R. 30-1, Calhoun Decl., at ¶¶ 12-13). They agreed that, due to Davis's indication that he was unhappy with the facility management for "allowing" the noose to be displayed at all, someone from outside the facility should be involved. (R. 30-3, Iacovetta Decl., at ¶ 11); (R. 30-1, Calhoun Decl., at ¶ 13). Calhoun was chosen to meet with Davis, and the group agreed that no one from the facility would approach Davis regarding the situation until Calhoun met with him. (R. 30-3, Iacovetta Decl., at ¶¶ 12-13); (R. 30-1, Calhoun Decl., at ¶¶ 14-15).

Havrilla also received a copy of Davis's letter on the day it was initially circulated, although not from Davis. Havrilla sent Iacovetta an email indicating his concern with the letter's effects, stating he felt that others were viewing him as a "monster." (R. 32, Exhibit 15). He also expressed concern that he would be terminated. (R. 32, Exhibit 16). Iacovetta responded that the focus of the situation would be on Davis's method of complaining outside the chain of command, not on the noose. (R. 33-2, Iacovetta Depo., at 30-31).

On February 1, 2008, a meeting was held where, according to Davis, Havrilla slammed a copy of the policy and procedure handbook on a table, complained that he had been told that he did not follow it, and mandated that his drivers learn it. (R. 31-1, Davis Depo., at 160-61). Although

Havrilla said nothing referencing Davis or the letter, Davis felt these comments were directed at him. (*Id.* at 162).

Calhoun ultimately visited the facility on February 21, 2008 and met with Davis the same day.[2] (R. 31-1, Davis Depo., at 177-78); (R. 30-1, Calhoun Decl., at ¶ 17). During this meeting, they discussed what had occurred and Omni-Care's potential responses. (R. 31-1, Davis Depo., at 184-85); (R. 30-1, Calhoun Decl., at ¶ 18). Calhoun eventually decided that sensitivity or diversity training should be provided, although Davis felt more serious measures were warranted, up to and including someone's termination. (R. 31-1, Davis Depo., at 184-85); (R. 30-1, Calhoun Decl., at ¶¶ 18-20). Before the meeting ended, Calhoun provided Davis with her cell phone number, and encouraged him to contact her if he had any further issues. (R. 30-1, Calhoun Decl., at ¶ 22).

Davis called Calhoun later that evening. The parties dispute the tone, as well as the level of Davis's agitation during the call, but Davis again conveyed his belief that this matter was serious and something more than diversity training should be done. (R. 31-1, Davis Depo., at 188-89). Calhoun reiterated her decision that she would not terminate anyone as a result of the incident, but confirmed that diversity training would occur. (R. 30-1, Calhoun Decl., at ¶¶ 23-24). Calhoun testified that while she found Davis's behavior during the call to be insubordinate, she decided not to discipline him because of his good performance record and the fact that he was clearly upset about the incident. (*Id.* at ¶ 25).

On February 22, 2008, the day after Davis's meeting with Calhoun, Omni-Care alleges that Davis stopped answering or returning phone calls from his router and supervisor regarding

---

[2] Calhoun's visit to the facility was delayed by the unexpected illness of her father, which required that she take some time off work. (R. 30-1, Calhoun Decl., at ¶ 16).

deliveries. (R. 30-5, Havrilla Decl., at ¶¶ 5-8); (R. 30-2, Wilson Decl., at ¶ 6). Havrilla immediately informed Iacovetta of this "communication breakdown." (R. 30-5, Havrilla Decl., at ¶ 11); (R. 30-3, Iacovetta Decl., at ¶¶ 16-17).

Iacovetta then alerted Calhoun and Masters to Davis's lack of communication. (R. 30-3, Iacovetta Decl., at ¶ 18); (R. 30-1, Calhoun Decl., at ¶ 26). Omni-Care insists this was an issue of great concern, as it created a risk that medical equipment or supplies, which might be life sustaining, would not be delivered. (R. 30-1, Calhoun Decl., at ¶ 34).

Conversely, Davis contends that no communication breakdown occurred. He argues that his failure to respond to messages regarding deliveries was not a communication breakdown, but rather the usual course of business. Davis alleges that his practice had always been to respond to a message only if he had a question about the order. (R. 32-1, Davis Aff., ¶ 20).

Although Davis disputes the existence of a communication breakdown, he does not dispute that he received two voicemails from Havrilla, and one voicemail from Iacovetta, and that he responded to none of them.[3] (R. 31-1, Davis Depo., at 178-80, 198-200). Havrilla's first voicemail set a meeting for February 25, and the other changed the date of the meeting to February 26. (*Id*. at 178-79).

On the morning of February 26, Davis saw Havrilla in the warehouse, but Havrilla did not initiate a meeting, so Davis left to make his deliveries. (*Id*. at 179-80). Davis then received a

---

[3] There is some inconsistency between the parties' recollection of the dates when voicemails were left for Davis and the number of voicemails. However, any dispute is not material, and the facts are recited according to Davis's recollection.

message from Iacovetta that if he wanted to discuss things, Havrilla and Iacovetta were willing to meet with him. (*Id.*).

Iacovetta, Calhoun, and Masters ultimately decided to hold a meeting with Davis on February 27, 2008, to discuss the communication issue, and Calhoun planned to participate via telephone. (R. 30-3, Iacovetta Decl., at ¶¶ 19, 21); (R. 30-1, Calhoun Decl., at ¶¶ 27-28). Havrilla averred that he left Davis a message informing him of the date and time of the meeting, and he also placed a written note in Davis's facility mailbox informing him that Havrilla needed to see him. (R. 30-5, Havrilla Decl., at ¶¶ 13-14).

Davis denies receiving any notification of the February 27 meeting prior to the morning of the meeting. (R. 31-1, Davis Depo., at 200-01).

Although the parties dispute whether Davis received prior notice of the meeting, the sequence of events that occurred that morning are not materially in dispute. Davis testified that while he was loading his truck that morning, Havrilla approached him and asked if he had time to talk with them. (*Id.* at 201-02); (R. 30-5, Havrilla Decl., at ¶ 16). Davis responded that he did not, and Havrilla responded "okay." (R. 31-1, Davis Depo., at 202).

Thereafter, both Havrilla and Iacovetta returned, and Iacovetta stated that Calhoun was on the phone and wanted to speak with Davis. (*Id.* at 203); (R. 30-5, Havrilla Decl., at ¶¶ 19-20); (R. 30-3, Iacovetta Decl., at ¶¶ 27-28). Iacovetta informed Davis that he did not get to choose. (R. 30-3, Iacovetta Decl., at ¶¶ 27-28). He could either talk with them or go home, and Davis chose to leave. (R. 31-1, Davis Depo., at 203-04). Davis testified that while on his way home, he received a voicemail telling him to report for work the next day at his usual time. (*Id.* at 206).

Accordingly, it is undisputed that Davis was informed that Havrilla, Iacovetta, and Calhoun wanted to meet with him, and specifically that Calhoun wanted to speak with him, and Davis refused to either meet with them or speak with Calhoun, and instead chose to go home.

On February 28, 2008, Iacovetta and Havrilla met Davis when he arrived for work and discharged him from his employment with Omni-Care. (R. 30-3, Iacovetta Decl., at ¶ 27); (R. 30-5, Havrilla Decl., at ¶ 23); (R. 31-1, Davis Depo., at 206). It is undisputed that Calhoun decided to terminate Davis, in consultation with Masters, after Davis refused to speak with her.[4] (R. 31-1, Davis Depo., at 207); (R. 34-1, Calhoun Depo., at 60).

In response to a question as to whether her decision to terminate Davis was based upon the allegation that Davis was not communicating, Calhoun specifically responded that her reason for terminating him was "him not speaking with me and specifically not speaking with me, and I'm the Area Director, that's direct insubordination. So at that point it really wasn't not communicating. It was insubordination." (R. 34-1, Calhoun Depo., at 60). According to Calhoun, if Davis had met with her to discuss the importance of communication, he likely would not have been disciplined, let alone terminated. (R. 30-1, Calhoun Decl., at ¶ 40).

---

[4] The exact date on which this decision was made is somewhat unclear. Calhoun's deposition testimony is different than both her declaration and the other relevant parties' testimony in that she stated that Davis refused to speak with her on two separate occasions. (R. 34-1, Calhoun Depo., at 58-59). Conversely, Havrilla, Iacovetta, and Davis all testified that Calhoun only requested, and thus Davis only refused to speak with her, on the morning of February 27. However, when discussing the order of the unfolding events, including relevant conference calls pertaining to this incident and Davis's termination, she testified that she was "not sure of the time line. There were several phone calls." (*Id*. at 57-58).

Regardless, it is undisputed that Davis refused to speak with Calhoun when she specifically requested to speak with him, which constituted insubordination. Accordingly, Calhoun's apparent mistaken memory as to the date on which this insubordination occurred is not material because Davis admits that the reason for the termination, his insubordination, in fact occurred.

On February 17, 2009, Davis filed his complaint in the Northern District of Ohio, alleging claims of a hostile work environment based on race and retaliation under both Title VII and Ohio Revised Code Section 4112.01, *et seq*. (R. 1, Complaint). Omni-Care filed its Motion for Summary Judgment on February 26, 2010, and in Davis's Response in Opposition to Omni-Care's motion, he withdrew his hostile work environment claims. (R. 32, at iv.). Accordingly, only the retaliation claims remained.

On June 1, 2010, the district court granted Omni-Care's Motion for Summary Judgment. Davis filed a timely notice of appeal on June 29, 2010. (R. 40).

II.

This court reviews a district court's grant of summary judgment de novo. *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 706 (6th Cir. 2006).

Rule 56(a) of the Federal Rules of Civil Procedure, as amended December 1, 2010, provides in relevant part that:

> A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

Amended Rule 56(c)(1) further provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The Committee Notes explain that the "standard for granting summary judgment remains unchanged" and that amendment "will not affect continuing development of the decisional law construing and applying" the standard. Fed. R. Civ. P. 56, Committee Notes at 31.

Under Rule 56, the moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (l986). The court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id.* at 587. In reviewing a motion for summary judgment, a court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

## III.

Davis's unlawful retaliation claim is analyzed under the *McDonnell Douglas* burden-shifting analysis, as he offers only indirect evidence of his claim.[5] *See Ladd v. Grand Trunk Western R.R., Inc.,* 552 F.3d 495, 502 (6th Cir. 2009). Under this scheme, a plaintiff must first establish the prima facie case of unlawful retaliation. *See id.* To establish this prima facie case, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) this activity was known to the defendant; (3) the defendant took a materially adverse action against the plaintiff or subjected the plaintiff to

---

[5] Davis's state-law claim is examined under the same analytical framework used to assess Title VII retaliation claims. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). Accordingly, the court will refer only to the Title VII claim, but the analysis applies equally to both.

retaliatory harassment; and (4) a causal connection existed between the protected activity and the materially adverse action. *See id.*

If a plaintiff successfully establishes a prima facie case, the burden of production then shifts to the defendant-employer to offer a legitimate, non-discriminatory reason for the employment action. *Id.* If the employer satisfies this burden, the plaintiff must then prove by a preponderance of the evidence that the proffered reason was pretextual. *Id.*

At summary judgment, the district court concluded that Davis established a prima facie case and that Omni-Care proffered a legitimate, non-discriminatory reason for discharging Davis. (R. 38, at 8-9). Neither of these findings is challenged on appeal.[6] The district court, however, further found that Davis failed to demonstrate that Omni-Care's legitimate, non-discriminatory reason for terminating him was pretextual, which Davis contends was error. (*Id*. at 13).
Davis asserts two primary arguments in support of his claim of pretext. First, he contends that his insubordination did not actually motivate his termination, and second, that Calhoun's decision was tainted by the retaliatory motivations of Havrilla and Iacovetta.

A.

To establish that a defendant's legitimate, non-discriminatory reason was pretextual, a plaintiff must produce sufficient evidence to allow a jury to reject the employer's proffered reason for the discharge. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009), *as*

---

[6] Although Omni-Care argues that the district court incorrectly concluded that Davis established his prima facie case, because this court agrees that Davis failed to demonstrate pretext, this argument will not be addressed.

*recognized in Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009). Because the plaintiff retains the ultimate burden of persuading the jury that the defendant discriminated against him, this burden is one of both production and persuasion. *See Ladd*, 552 F.3d at 502.

A plaintiff can establish pretext by demonstrating the proffered reason was either: (1) factually false, (2) did not actually motivate the discharge, or (3) was insufficient to warrant the discharge. *See Manzer*, 29 F.3d at 1084. On appeal, Davis argues that Omni-Care's legitimate, non-discriminatory reason did not actually motivate the discharge.[7]

Under this theory, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id.* Thus, Davis contends that the illegal motivation, which he argues is retaliation for his complaint about the noose, was more likely the cause of his termination than Omni-Care's proffered reason of insubordination.

Davis points to several alleged retaliatory incidents in support of his contention that he was discharged in retaliation for his complaint about the noose. Specifically, Davis lists the allegedly retaliatory intent of both Havrilla and Iacovetta, as evidenced by the emails following circulation of Davis's letter; their public display of anger and contempt towards Davis; the fact that Davis felt "shunned;" the false accusations of Davis's failure to follow the communication policy, leading to

---

[7] Omni-Care contends that this is a new argument asserted on appeal and thus should be disregarded by this court. *See J.C. Wyckoff & Assoc., Inc. v. Standard Fire Ins., Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991) (noting that issues not presented before the district court and raised for the first time on appeal are not properly before the court). While Davis uses new phrasing to explain his argument, he merely appears to combine what were two separate arguments before the district court into one argument on appeal, and expands an argument made only in passing below. However, the overall substance of the argument is the same, and therefore it is properly before this court.

allegations of a "communication breakdown;" and Havrilla and Iacovetta misleading Davis regarding a corporate representative's desire to speak with him.

Assuming that these incidents are, in fact, retaliatory incidents, they in no way demonstrate that either Calhoun or Masters had retaliatory intent, as they only involve Havrilla or Iacovetta. Because Calhoun made the decision to terminate Davis, Davis's alleged retaliatory incidents are relevant to the issue of pretext only to the extent that Calhoun was involved in some way with them, because only then could retaliation serve as a competing motive for the termination. *See Roberts v. Principi,* 283 F. App'x 325, 332 (6th Cir. 2008) (recognizing that whether some co-workers reacted to protected activity is irrelevant unless those individuals in some way caused the adverse employment action).

Examination of Davis's cited incidents reveals that they do not demonstrate that Calhoun had retaliatory intent because she was not involved in any of the incidents. She was not involved with the emails between Havrilla and Iacovetta that allegedly demonstrate retaliatory intent. She also in no way publicly displayed anger or contempt for Davis, nor did she shun him. Quite the opposite, the record reflects that Calhoun went out of her way to be accessible to Davis to discuss any issues he might have. She traveled from Pittsburgh, Pennsylvania to meet with Davis and ensure that he felt comfortable at work. She discussed potential company responses to the situation and asked for his input, and she gave him her cellular telephone number so that he could have direct access to speak with her.

Calhoun also did not participate in creating an allegedly false "communication policy" or in fabricating the resulting "communication breakdown." In fact, she repeatedly tried to set a

meeting with Davis to discuss the communication situation. Therefore, the allegedly retaliatory events in no way involve Calhoun and do not demonstrate Calhoun had a retaliatory motive. Accordingly, Davis has failed to show that retaliation was more likely the reason for Davis's discharge.

B.

To the extent that Davis attempts to argue the "cat's paw" theory of liability--essentially that Havrilla and Iacovetta tainted Calhoun's decision to terminate Davis through their retaliatory motives--this argument fails.

This theory involves circumstances where a seemingly unbiased decisionmaker makes an adverse employment decision that was in part motivated by a biased subordinate. *See Cobbins v. Tenn. Dept. of Transp.*, 566 F.3d 582, 586, n.5 (6th Cir. 2009); *Arendale v. City of Memphis*, 519 F.3d 587, 604 n. 13 (6th Cir. 2008) (noting that "[w]hen an adverse hiring decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability").

When a plaintiff challenges "his termination as motivated by a supervisor's discriminatory animus, he must offer evidence of a 'causal nexus' between the ultimate decisionmaker's decision to terminate the plaintiff and the supervisor's discriminatory animus." *Madden v. Chattanooga City Wide Serv. Dept.*, 549 F.3d 666, 677 (6th Cir. 2008).

The Supreme Court recently addressed the "cat's paw" theory in *Staub v. Proctor Hospital*, 131 S. Ct. 1186 (2011). In that case, the Court held that "if a supervisor performs an act motivated

by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."[8] *Id*. at 1194 (emphasis in original).

Accordingly, for purposes of Title VII cases, if a supervisor acts with a discriminatory or retaliatory animus, and the act is intended to cause, and is a proximate cause of, the ultimate employment action, the employer is liable under the "cat's paw" theory. *See McKenna*, 649 F.3d at 178-79.

In the situation at hand, Davis cannot establish that the retaliatory motives of Havrilla and Iacovetta, assuming such motives existed, proximately caused Davis's termination because Calhoun's decision was the result of an undisputed event. In response to a question as to whether her decision to terminate Davis was based upon the allegation that Davis was not communicating, Calhoun specifically responded that her reason for terminating him was his insubordination in refusing to speak with her, not his general lack of communication. (R. 34-1, Calhoun Depo., at 60).

Even accepting Davis's contention that he was never informed that Calhoun wanted to speak with him prior to February 27, 2008, he admits that he refused to speak with her that morning and that he chose to go home when given the option of either speaking with her or leaving. This statement of events is entirely consistent with what was conveyed to Calhoun by Havrilla and Iacovetta.

---

[8] While this case involved the United Services Employment and Reemployment Rights Act of 1994 ("USERRA"), the Supreme Court recognized that this statute was "very similar to Title VII," *see Staub*, 131 S. Ct. at 1191, and its holding has been applied to cases brought pursuant to Title VII. *See Bissett v. Beau Rivage Resorts, Inc*., No. 11-60239, 2011 WL 4398135, at *1 (5th Cir. Sept. 22, 2011); *McKenna v. City of Philadelphia*, 649 F.3d 171 (3d Cir. 2011); *Crowe v. ADT Sec. Servs., Inc*., 649 F.3d 1189 (10th Cir. 2011).

Thus, even assuming that Havrilla and Iacovetta had misled Calhoun about Davis's general lack of communication and his prior notification of the February 27 meeting, the event that actually caused his termination, his insubordination in refusing to speak with Calhoun, is untainted by either Havrilla or Iacovetta.

To the extent that Davis contends that Calhoun's decision to terminate him was the result of his alleged refusal to speak with her a second time, on February 28, this argument fails. Davis argues that he only refused to speak with her once, on February 27, and that he was never given the opportunity to speak with her on February 28 because he was terminated upon his arrival for work that morning. He attempts to argue that Calhoun terminated him for refusing to speak with her a second time, and so because he did not refuse to speak with her a second time, Havrilla and Iacovetta must have lied to Calhoun about this alleged refusal, ultimately tainting the termination decision.

However, Davis mischaracterizes Calhoun's testimony. While Calhoun's deposition states that Davis refused to speak with her twice, her unambiguous reason for terminating him was his refusal to speak with her at all, not his refusal to speak with her a second time. (R. 34-1, Calhoun Depo., at 57, 60). Because Davis admits that he refused to speak with her, and that this insubordination caused the termination, the date on which it occurred, or the number of times, is immaterial. Therefore, Calhoun's termination decision was not tainted by either Havrilla or Iacovetta because it was the result of an undisputed event.

Furthermore, Davis's contention that Calhoun considered the communication breakdown allegedly fabricated by Havrilla and Iacovetta in making the termination decision also fails. As

reflected in Calhoun's response to whether she considered the communication breakdown in reaching her decision, her reason was not his *general* failure to communicate, but rather his *specific* refusal to communicate with her, which was insubordinate. Calhoun's reference to Davis's alleged lack of communication with Havrilla and his router related only to the general reason it was important that Davis communicate with Calhoun—to resolve any outstanding issues so that things could return to usual. However, it was Davis's refusal to speak with Calhoun, not his general failure to communicate, that resulted in his termination.

This conclusion is further supported by Calhoun's statement that, had Davis spoken with her, he likely would not have been reprimanded. (R. 30-1, Calhoun Decl., at ¶ 40). Thus, contrary to Davis's assertion that he was terminated in part because of the "communication breakdown," it appears that if only this "break down" had occurred, it would not have even resulted in a reprimand, let alone termination.

Therefore, Calhoun's decision was not tainted by Havrilla or Iacovetta, and Davis fails to demonstrate that either Havrilla's or Iacovetta's alleged retaliatory motive was a proximate cause of Calhoun's decision to terminate Davis.

IV.

For the foregoing reasons, we AFFIRM.

**HELENE N. WHITE**, Circuit Judge, dissenting.  I respectfully dissent.  The parties agree that, after Davis distributed his letter of complaint regarding the noose on January 31, 2008,[9] Iacovetta removed the noose from the bulletin board and told Davis that she had "handled it."  Davis understood Iacovetta's comment to mean that the noose was removed, and that the matter was closed.  R. 32-1 at 2.

Havrilla, Davis's immediate supervisor, worked in the area where the noose had been hanging on a bulletin board.  Havrilla received a copy of Davis's letter that day, although not from Davis.  That afternoon Havrilla sent Iacovetta an email asking "How do you want me to handle this issue [Davis's letter]?"  Iacovetta responded, "Wait for me.  Keep your mouth shut."  Havrilla then emailed Iacovetta that "Everyone is looking at me like I am a monster," to which Iacovetta responded, "Well, you put the noose around your own neck."  R. 32-6.

The following day, February 1, 2008, Havrilla came to a meeting of the drivers and slammed the policy and procedure book down on the desk, complaining that he had been told that he did not follow it, and told the drivers they had to learn it.  Davis felt that Havrilla's ire was directed at him, R. 31-1 at 40-41, that the workplace environment changed after his complaint about the noose, and that he was being shunned.  R. 31-1 at 40; R. 32-1 at 2.

On February 3, Havrilla emailed Iacovetta, "My wife wants to know if I am getting fired?"  Iacovetta's response included, "All focus is on his [*sic*] and the method he took rather than following chain of command and coming to me if he was uncomfortable talking to you."  R. 32-7.  A reasonable jury could infer from these emails that Iacovetta and Havrilla were unhappy with Davis

[9]The photo of the noose in the record dispels the possibility that it could be perceived as anything other than a noose.

as a result of his complaint and were less interested in investigating Davis's complaint than on faulting Davis's method of distributing copies of his letter of complaint.

That inference is strengthened by the fact that for the three or so weeks following Davis's distribution of his letter on January 31, 2008, Davis was not made aware that *anything* was being done regarding his complaint. Davis testified that no one in management communicated with him regarding the matter until late February, when Iacovetta said to him that "someone" from the corporate office was going to call him about his "little letter," R. 31-1 at 182-183, a remark that can easily be interpreted as expressing animosity.

Unbeknownst to Davis, Iacovetta had contacted Calhoun regarding the noose matter and Calhoun told Iacovetta that she planned to travel from the corporate office to meet with Davis. There is no dispute that Iacovetta, Havrilla and Calhoun agreed that nothing would be said to Davis until Calhoun arrived from the corporate office. And, although Calhoun's visit was delayed by weeks due to a family emergency, Omnicare omits that Calhoun's involvement in the matter and her forthcoming visit were not communicated to Davis. Thus, during the three or so weeks between Davis's complaint and Iacovetta's cryptic comment that someone from the corporate office was going to call him regarding his "little letter," as far as Davis knew, nothing was being done regarding his complaint.

On February 21, 2008, Havrilla told Davis that someone from the corporate office was there to see him. Because Davis had not been advised that someone was actually coming to his worksite to meet with him, Calhoun's on-site visit took Davis by surprise.

After meeting with Davis on February 21, Calhoun determined that diversity training would sufficiently address the noose matter and that no one would be disciplined. During the meeting, Davis had told Calhoun that he believed disciplinary action was in order. Calhoun testified that Davis wanted Iacovetta and Havrilla terminated. More importantly, Calhoun testified that she told Iacovetta after her meeting with Davis that Davis was upset with Iacovetta's handling of the noose matter. R. 34-1 at 52-53. In addition, Calhoun testified that she may have told Iacovetta and Havrilla that Davis wanted their employment terminated. R. 34-1 at 53-56.

Unbeknownst to Davis, the week after Calhoun met with Davis, Havrilla reported to Iacovetta and Iacovetta then reported to Calhoun and Masters (the facility Human Resources representative) that Davis was not responding to phone calls and text messages from his router and Havrilla. Calhoun instructed Iacovetta to notify Davis both by phone and in writing that she, Calhoun, wanted to speak to Davis about this purported communication breakdown. Davis testified that he received no such notice and Omnicare presented no evidence to support that anyone spoke to Davis regarding the purported communication breakdown, which Davis denies occurred.

Against this backdrop, Havrilla left a voicemail message for Davis stating that he would like to sit down and talk on February 25, and a later message changing the date to February 26. Havrilla did not state a time or place in either message. On February 26, Davis was in the warehouse for at least an hour and both Havrilla and Iacovetta saw him, but did not approach him. So Davis left to make his deliveries. Iacovetta called him later that morning and said she was sorry that they, she and Havrilla, had missed him and that if there was anything Davis wanted to talk to them about, they would be in the office until 5 and 6 p.m., respectively.

On February 27, Havrilla came out as Davis was loading his truck and asked whether Davis had time to sit down to talk to him and Iacovetta that morning. Davis responded that Calhoun had made her decision about what she was going to do about the noose, and that he had a lot of work to do and did not have the time to sit down and talk that morning. Havrilla responded "okay" and walked inside the building. Davis testified that as he was getting ready to leave to make deliveries, he walked in the building, and Havrilla and Iacovetta were standing there. Iacovetta told him that Calhoun was on the phone and that Calhoun wanted to speak with him. This was the first that Davis knew of Calhoun's involvement, and because he did not know that Calhoun wanted to discuss the purported communication breakdown with him, he assumed that she wanted to discuss the noose matter. Davis responded that Calhoun had decided to handle the noose with diversity training and that he had nothing else to say. At that point, Iacovetta said to him that he did not get to choose – that he could sit down and talk or go home. Davis chose to go home. On his way home Davis received a message from Iacovetta that he was to report to work the next day.

Davis testified that at no time did he receive notice that Calhoun required that he speak to her, or that Calhoun wanted to speak to him about the purported communication breakdown. Davis first learned that Calhoun was involved when Iacovetta said to him on February 28 that Calhoun was on the phone. He was not told that Masters was on the phone, either. Davis at that point assumed that Calhoun wanted to speak to him about the noose – he did not know that Calhoun intended to address an alleged communication breakdown. In sum, Davis had no notice that he was required to talk to Iacovetta and Havrilla, or that Calhoun and Masters required that he speak with them by phone on February 27, or the subject matter of the conference call.

Calhoun decided to terminate Davis's employment for insubordination based on her understanding that Iacovetta and Havrilla had told Davis that Calhoun required that Davis speak with her regarding Davis's communication breakdown, when in fact, Davis received no such notice.

When Davis reported to work the following day, Iacovetta and Havrilla terminated his employment. Calhoun testified that had Davis spoken to her on the conference call, she likely would not have decided to terminate or even discipline him – she would have given him a second chance.

Calhoun's deposition testimony makes clear that Iacovetta and Havrilla reported to her that Davis persisted in refusing to speak to Calhoun after Davis had been told that she wanted to talk to him. The majority's contrary reading of the record is plausible, but it does not view the facts in a light most favorable to Davis. I would reverse the grant of summary judgment and remand the case to the district court for further proceedings.