NOT FOR RECOMMENDED FOR PUBLICATION
File Name: 14a0661n.06
No. 13-4033

**FILED**

**AUG 2 5 2014**

**DEBORAH S. HUNT, Clerk**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GERALYN A. GOODSITE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| NORFOLK SOUTHERN RAILWAY | ) | COURT FOR THE NORTHERN |
| COMPANY; JAMES ROSKOVICS, | ) | DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

BEFORE:   SUHRHEINRICH, KETHLEDGE, and WHITE, Circuit Judges.

**SUHRHEINRICH, Circuit Judge:**   Plaintiff Geralyn Goodsite ("Plaintiff") sued Defendants Norfolk Southern Railway Company ("Norfolk Southern") and James Roskovics ("Roskovics") (collectively "Defendants"), for retaliatory termination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), and Ohio Revised Code § 4112.   The district court granted summary judgment to Defendants.   Plaintiff appeals.   We affirm.

## I. Background

Plaintiff worked for Norfolk Southern from October 2002, through June 2010, at its Bellevue, Ohio rail yard ("Bellevue Yard") until she was terminated in August 2010 for insubordination and walking off the job. In 2008, she became a carman, joined the union, and became subject to a collective bargaining agreement ("CBA").

Carmen inspect and fix railroad cars, either inside a repair shop or outside in the yard. Initially, Plaintiff was assigned to work in the shop, but in March 2009, attained enough seniority to bid on a carman position in the yard. In the yard, carmen are assigned to six-person teams, with the following job assignments: (1) the A-yard position, responsible for examining trains when they arrived in the yard; (2) the "single" position, responsible for inspecting the air pressure of the train's braking system; and (3) the "tie-in" position, responsible for connecting the train's air hoses to prepare for departure. Four carmen are assigned to the "tie-in" position, working in two-person teams. The carman working the single position spends much of his or her time driving around the yard in a truck with a radio communication system. The tie position carmen walk along the long trains in the yard in performing their assignments. ID# 285-90.

Roskovics was the General Foreman of the Bellevue Yard. Plaintiff's immediate shift supervisor was Chris Davis.

## A. Protected Activity and Materially Adverse Actions

In a six-month period prior to her removal from service on June 11, 2010, Plaintiff filed several complaints with the Equal Employment Opportunity Commission ("EEOC") and Defendants, alleging discriminatory treatment.[1] These included Defendants' handling of the alleged sabotage of trains on Plaintiff's shift, Defendants' failure to remove offensive graffiti directed at Plaintiff, and allegedly discriminatory scheduling practices.

## 1. The Sabotage Report

On December 12, 2009, Plaintiff filed a written complaint with Roskovics that another employee had sabotaged trains that she and a partner had been working on as part of a tying

---

[1] In May 2008 Plaintiff filed a formal complaint with the EEOC claiming that: (1) she had been denied promotion to both electrician and machinist positions; (2) she had failed to receive credit for time spent training; and (3) she had been removed from the safety committee. The EEOC issued her a right to sue letter in June 2009. ID# 426-28.

2

crew. A copy of this report was emailed to the EEOC on December 18, 2009, and copied to Roskovics and Chris Davis on December 19, 2009. Plaintiff alleged that someone had closed the anglecock in order to affect the air pressure of the trains' braking system and cause a train delay. Roskovics told her he would investigate. Plaintiff identified three possible suspects, Jim Davis, Rick Huffman, and Joe O'Brien. Roskovics interviewed the suspects. All denied wrongdoing. Roskovics met with Plaintiff at the end of December. In her affidavit she stated that Roskovics "subsequently told me that he investigated my sabotage report and that he was unable to corroborate my report and could not determine whether the anglecock had been closed or who had closed them." ID# 1185. Roskovics testified in his deposition that he was not able to establish the train sabotage in fact happened, but he left open the possibility that it did. ID# 617. However, at a later point in his deposition, Roskovics acknowledged that he interviewed Jim Davis, and that Davis corroborated Plaintiff's allegation that the anglecock had been closed. ID# 662. Roskovics admitted that he believed Davis and Plaintiff that the anglecock was in fact closed, but that he "just [doesn't] know who did it." ID# 662.

Notwithstanding, Roskovics apparently told Norfolk Southern management that the claims were unsubstantiated. EEO Officer Jamie Bellamy-Horne concluded after investigation that Defendants found no evidence to substantiate that someone tried to sabotage the trains, after speaking with Roskovics. ID# 825. EEO Officer Susan Decker testified to similar effect. She stated that "supervision had thoroughly investigated and found that it was unable to substantiate that sabotage had happened," and that this determination was based on "[i]nformation received from Roskovics." ID# 799.[2]

---

[2] Plaintiff asserts that as a result of Roskovics' false report to NS management, Defendants provided false information to the EEOC in connection with this issue. In her May 7, 2010 charge, Plaintiff specifically referred to the sabotage incident. In its position statement, Norfolk Southern stated that "[t]he Company thoroughly

## 2. Graffiti

In January 2010, Plaintiff complained to Roskovics about sexually graphic and offensive graffiti directed at her.[3] The graffiti was painted on the interior of a disabled old caboose in the western portion of the Bellevue Yard that was used as a break room and bathroom by Norfolk Southern employees. Roskovics said that he would investigate and have it painted over. Plaintiff claims that never happened. A week or two later Plaintiff informed Roskovics of additional graffiti, which stated "kill me now" with an arrow pointing toward Plaintiff's name.

Roskovics testified that he "went and saw" the graffiti, and had it painted over. Roskovics claimed that he painted over some of it himself. He instructed his supervisors to check the site once a day for graffiti. ID# 618-19. Roskovics stated that he did not undertake any investigation to find out who the perpetrator was, because he "[d]idn't know how I would investigate that." ID# 619. On the other hand, Roskovics informed the employees at shift meetings on every shift that graffiti had been discovered in the caboose bathroom and that graffiti would not be tolerated. ID# 629. Roskovics told Plaintiff that she could use a bathroom in the West Yard, although it was "quite a distance" from the East Yard, where the carmen worked. ID# 619-20.

## 3. Safety Concerns

Plaintiff also expressed her concerns about her safety to Roskovics and management on several occasions. In particular, she was afraid to work alone and with several individuals, namely Joe O'Brian, Anthony Renner, and Rick Huffman. O'Brien and Huffman were on her list of suspects regarding the train sabotage. Roskovics admitted that Plaintiff asked him to not

---

investigated the Charging Party's allegation and was unable to substantiate that someone sabotaged the trains she was working on." ID# 858.

[3] The graffiti stated "Geri Goodsite for life" and had a drawing of a female crotch next to it that also stated "bloody pussy would taste great" and "thunder thighs."

be assigned with these individuals. ID# 609. He also stated that, as the senior general foremen, he had discretion to set work schedules, but that discretion depended on the job, seniority, and the fact that he "couldn't have everybody coming in and saying I don't want to work with such and such because I don't trust him . . . then I would have everybody working by themselves." ID# 609. Roskovics stated that he personally did not have any concerns about O'Brien's, Renner's, or Huffman's trustworthiness. ID# 608.

### 4. Shift Scheduling

In February 2010, Plaintiff sent several emails to the EEOC alleging discriminatory shift scheduling. In an email dated February 12, 2010, Plaintiff alleged that male workers were allowed to select their job assignment but she was not. Roskovics and Chris Davis were copied on the email. ID# 1187, 1192. On February 17, 2010, Plaintiff met with Chris Davis and General Foreman Steve McClung and reiterated her concerns. She also raised concerns about working with Huffman in light of his sexual advance towards her in 2007. According to Plaintiff, McClung acknowledged to her that he was aware of her contact with the EEOC. ID# 1187. On February 19, 2010, Plaintiff sent another email to the EEOC, with copies to Roskovics, Chris Davis, and McClung, summarizing the February 17, 2010 meeting. ID# 1187, 1198-1201.

Plaintiff stated in her deposition that on days she was assigned to work the single position, she would take a vacation day or personal day. ID# 454.

On February 22, 2010, Decker contacted Plaintiff regarding the scheduling issues, and told Plaintiff the alleged priority given to male employees in selecting their jobs was not an EEO violation. ID# 1187-88. Decker admitted that she discussed Plaintiff's safety concerns with her, but was not able to recall what those safety concerns were. ID# 800-01. Decker also stated that

5

if Plaintiff had raised any issues regarding the sabotage incident, Decker "would have said that was thoroughly investigated already." ID# 800-01.

### 5. Other Complaints

On May 7, 2010, Plaintiff filed a discrimination charge with the EEOC alleging gender discrimination and retaliation for filing an earlier EEOC charge. ID# 587-89. In this charge Plaintiff specifically referenced the December 12, 2009 train sabotage incident and alleged that she was being discriminated against by not being allowed to select her job assignments when male workers were. She also claimed retaliation by being forced to work alone with Huffman. Three days before she was removed from service, she made additional allegations to management regarding the posting of new graffiti directed at her. The event that led directly to her removal from service and termination occurred on June 10, 2010.

## B. June 10, 2010

Plaintiff reported to work on the second shift as scheduled that day, and attended the safety meeting that routinely occurred at the start of the shift. At the safety meeting, Chris Davis assigned Plaintiff to the single position, the job that remained after the more senior employees chose their jobs. Apparently it was common practice among workers with seniority to choose their work partners. Two workers more senior to Plaintiff chose workers junior to Plaintiff to be their partner on the tie-crew position.[4]

Plaintiff objected, because she believed that she had seniority and she wanted to work the tying position. Davis told her to work the job as assigned. Plaintiff refused and went to

---

[4]This left the A-yard position and the single position. Presumably the third worker with more seniority than Plaintiff chose the A-yard position.

6

Roskovics's office to have it changed. Davis acknowledged that this was the proper procedure. ID# 730.

Earlier that day, Decker called Roskovics to discuss a complaint Plaintiff filed on June 7, 2010, stating that she had discovered new graffiti on June 4, 2010. When Plaintiff arrived at Roskovics' office to complain about her shift assignment, Roskovics called Decker. Plaintiff testified that she told Decker that Roskovics did not paint over the original graffiti. ID# 1189-1190. In his deposition, Roskovics admitted that he was "offended" and "upset" with Goodsite for "accusing me of not doing what I said I did." ID# 624.

Roskovics and Plaintiff also testified that they discussed Plaintiff's concerns about not having a safe working environment and working a single person's job. ID# 624, 1189. Plaintiff claims that when Decker asked her if she had ever been physically harmed on the job, she told her not physically, but that she had been emotionally harmed, and that Decker told her that was not her concern. ID# 1189-90. Decker did not recall discussing anything other than the graffiti. ID# 802.

After the phone conversation ended, Plaintiff and Roskovics continued to talk. Plaintiff told Roskovics that she did not feel safe working alone and that she felt that the jobs were not being properly assigned according to seniority. ID# 458-59. Roskovics refused to change the assignment. ID# 460, 625.

Roskovics admitted in his deposition that he had the "sole discretion" to overrule Davis and switch Plaintiff with one of the members of the tie crews and that nothing in the CBA would have prohibited that. ID# 649. Roskovics said he didn't exercise that discretion because "I felt that if I did it that time I would have to do it every time she would have been instructed to work a

7

single job or the A yard job when she was by herself." ID# 649. Roskovics felt this would create perception problems for the other employees.

The parties disagree about what happened next. According to Plaintiff, she then asked: "May I be excused?" Plaintiff claims Roskovics answered, "Yes" and that she left his office. "Believing that she had been excused from work, [Plaintiff] left the premises and went home." Appellant's Br. at 3. Plaintiff admits that she did not tell anyone that she was leaving the premises. ID# 460. Roskovics testified that after he told Plaintiff that he expected her to go out and do her job, Plaintiff walked out of his office without saying anything. ID# 648. He said that Plaintiff did not ask to be excused. ID# 648.

Davis was waiting outside Roskovics' office and saw Plaintiff "storm[] out." ID# 731. Davis told Roskovics that he had assigned Plaintiff to a job during the safety meeting and that she had twice stated that she was not going to work the assignment. Davis and Roskovics searched for Plaintiff for about 20 minutes, until they learned that she had left the property. ID# 732. Because Plaintiff was not there, Roskovics had to shut down one of the tracks in the shop and send one of the shop employees to fill Plaintiff's position that evening. ID# 651.

Roskovics contacted his supervisor, David Price, who told Roskovics to contact labor relations. ID# 651. Labor relations told Roskovics to remove Plaintiff from service. ID# 652. On June 11, 2010, Roskovics informed Plaintiff that she was removed from service pending a formal investigation. ID# 654. Plaintiff was charged with being insubordinate by failing to follow Davis's instruction to work the single position and for leaving her assigned position without permission in violation of Norfolk Southern's Safety and General Conduct Rules. ID# 462.

8

## C. The Investigative Hearing

Plaintiff's investigative hearing ("Rule 29 hearing") was held on July 29, 2010, before Gregg R. Swany, a Norfolk Southern Division Manager of Mechanical Operations from Birmingham, Alabama. Swany stated in his affidavit that prior to the Rule 29 hearing, he did not receive any specific information concerning the charges against Plaintiff, did not receive any witness statements or other material to review, and did not speak with Roskovics. ID# 155. He also did not know that Plaintiff had filed complaints with Defendants or the EEOC. ID# 156.

Roskovics, Davis, three carmen, the carman leader, and Plaintiff testified. ID# 156. Roskovics, as the Charging Officer, read a Letter of Charge into the record. ID# 534. It stated that Plaintiff was charged with conduct unbecoming an employee based on her act of insubordination "by failing to follow the instructions given you by Mechanical Supervisor C.D. Davis . . . to 'work the single position' in Bellevue Yard . . . on June 10, 2010"; and her act of "absenting yourself from your assigned position on the second shift . . . without proper authority[.]" ID#534-35. Roskovics testified that he "was prompted to bring these charges against Ms. Goodsite" based on Chris Davis's report that Plaintiff twice refused his instruction to work the single job, countering that "was going to tie hoses." ID# 539. Carmen Ryan Clapp ("Clapp"), Russ James ("James"), and Robby Heath Jr. ("Heath"), confirmed that at the safety meeting Plaintiff testified refused to work the single job. James testified that:

> After the conclusion of the safety meeting on this day, Mr. Davis gave out the job assignments in the yard. Ms. Goodsite told him that she was not going to run single. I am tying hoses. I'm older in seniority than two other people in the yard. Mr. Davis then instructed her that she was to – or told to run single, and she again told him that she was not going to run single, and the safety meeting concluded, and we did our stretches.

ID# 559. Clapp stated that when Davis told Plaintiff she would be running single, Plaintiff "responded by saying that she wasn't running single and that she was tying hoses. . . . She then

9

stated that there are two people with less seniority than her, and she should not have to run single." ID# 561. Heath indicated that Plaintiff "said she would not run single because she had seniority[.] . . . She felt as though she should have been able to not run single as she had seniority[.]" ID# 563.

Steve Notch, the carman leader, testified that he saw Plaintiff get in her car and drive away. ID# 566.

Chris Davis testified that after he informed Plaintiff that she would be running single that night,

> [h]er answer to me was no, I'm not. I'm going to be tying hoses. I'm older than another employee, Jim Davis, is what I was told. At that point in time, I, I, you know, I, I told Ms. Goodsite, you know, we were doing it by seniority, and she had told me that, that we weren't doing it the correct way by seniority, and I said well, this is the way that we're going to do it, and again I instructed her to – that she'd be running single and with the same response no, I'll be tying hoses.

ID# 556.

Davis stated that by the time he got to Roskovics' office after the safety meeting to inform him what happened, Plaintiff was in a closed meeting with Roskovics. ID# 557. After she came out, Davis met with Roskovics and Roskovics instructed Davis "to go find Ms. Goodsite, that we needed to talk to her." ID# 557.

Swany asked Plaintiff to explain "what happened that afternoon relative to the two items in this charge?" ID# 568. Plaintiff explained that on June 4, 2010, she noticed more graffiti and she sent an email on June 7, 2010 to Norfolk Southern's EEO email, because she was "very concerned and very uneasy about going to work." ID# 568-69. Her next scheduled work day

10

was June 10, 2010. After the more senior members picked their jobs and partners, she was the only one left:

> So, I just said to Chris Davis if you're going by seniority, and I'm number four—I don't know if I stated number four—but I said if you're going by seniority, then I should not have to be single. And he said well, that's the way we're doing it or whatever. I don't remember the exact words, but I never refused, never once refused to run single. I only stated if you're going by seniority, then I should not have to be single. And he said well, that's the way we're doing it or whatever. I don't remember the exact words, but I never refused, never once refused to run single. I only stated if you're going by seniority that it was incorrect. And never once refused to do the job.

> . . . .

> As we left, . . . I went to Roskovics' office basically directly after. . . . And I just said to Jim—I think I said something to the effect of doing seniority, and I was, I was shocked that he said I need you in here, and we need to shut the door. He said I have NS's EEO, Susan Decker, which we had had a previous conversation back in February about this, and it was about me sending that e-mail prior to coming to work. So we discussed the graffiti, and she informed me that her first knowledge of it was on Monday and that she assured me that it had been painted over and I, I, I'm not sure how the, the events went, but I –we discussed safety, seniority. . . . .

> . . . .

> . . . So after we hung up the phone, Jim Roskovics was very upset with me and said he wanted to know why I made him look bad to the EEO woman. . . and I said well then, may I be excused, and he said yes, and I had my bag in hand, and I left. So I –to me he had full knowledge that I was leaving. I was never informed – we were informed if we were going to mark off work, leave, not come in, that we only need to talk to a Supervisor, not the Supervisor on duty or for that shift. . . . [S]o as far as I'm concerned, when I left that day, I had full permission from Jim Roskovics to leave. . . . I didn't, I didn't refuse to perform a job. I didn't refuse to – I didn't refuse anything, and I had permission from him to leave.

ID# 569-71.

11

Swany also asked Plaintiff to clarify whether she told Roskovics or any of the supervisors that she was leaving the property. ID# 572. She said she did not. ID# 574. She told Swany that she believed the charge was in direct retaliation for her complaints about the graffiti. ID# 573.

Swany asked Roskovics whether Plaintiff expressed any concern to him about her personal safety while working the single position in the yard because a murder had recently occurred nearby.[5] Roskovics replied that Plaintiff said that Defendants "were making an unsafe work environment for her," but never said anything about a murder. ID# 208. Swany asked Roskovics: "When your meeting with Ms. Goodsite was over, did she ask you if she could be excused or if she was excused?" ID# 208. Roskovics replied, "No." Roskovics also denied that Plaintiff told him she was leaving the property or going home. ID# 208.

On August 17, 2010, Swany found Plaintiff "guilty as charged" based on the testimony and evidence presented at the hearing. ID# 243. Swany then terminated her employment. Plaintiff appealed Swany's decision to the Director of Labor Relations, which affirmed, and she then appealed to the Public Law Relations Board, which affirmed. The Public Law Board stated in key part that:

> The Board concurs with the long line of awards that holds that the workplace is not a debating society and that absent an objective, bona fide safety exception, an employee, such as the Claimant, is required to follow supervisory instructions. Also, the Claimant's decision to leave work early without permission constituted a serious violation of the Carrier's rules.

ID# 584.

---

[5] On June 9, 2010, the day prior to the June 10, 2010 incident, the body of a woman was discovered in a pond north of the Bellevue Yard. The newspaper ran an article on June 10, 2010, stating that the woman was believed to be a victim of homicide and potentially a victim of sexual assault. ID# 240. The article was included in Plaintiff's list of exhibits presented at the investigative hearing. ID# 212. However, Plaintiff does not mention, let alone rely upon, this fact on appeal.

The EEOC held a fact finding conference regarding the charge on December 12, 2010, and on February 10, 2011, issued a decision concluding that no violation of any statute could be found. ID# 595-97.

## D. Procedural History

Plaintiff brought suit in state court. Norfolk Southern and Roskovics removed it to federal court. Plaintiff's amended complaint alleges retaliation under Title VII and Ohio law, claiming that Defendants retaliated against her for filing EEOC charges and reporting sexual harassment in violation of Title VII, 42 U.S.C. § 2000e-3(a) and Ohio Revised Code § 4112.02(I). Defendants moved for summary judgment.

## E. District Court Opinion

The district court granted summary judgment to Defendants. Defendants did not contest the first and second elements of Plaintiff's prima facie case. Plaintiff asserted that the following actions by Defendants were materially adverse actions: (1) Roskovics' "lies" regarding the outcome of his investigation of the train sabotage; (2) Roskovics' refusal to remove the offensive graffiti; (3) Roskovics' requiring Plaintiff to work alone even though she felt unsafe because of the sabotage and graffiti; (4) Roskovics' refusal to alter Plaintiff's work assignment on June 10, 2010, even though she felt unsafe and (5) her removal from service and termination. Defendants claimed that only Plaintiff's removal from service and termination qualify.

The district court concluded that the first four incidents were not materially adverse employment actions. The district court found that Roskovics' sabotage report, which failed to substantiate' Plaintiff's claim, was not an adverse employment action but rather "a straight-forward report based on interviews that had no apparent impact on the conditions of Plaintiff's employment." ID# 1286. The court noted that Roskovics could not determine who closed the

13

angle cocks and he found no proof that the incident was directed at Plaintiff. ID# 1286. The district court rejected Plaintiff's claim that Roskovics withheld information about his investigation from the official report, because she did not learn of this alleged omission until after she had been terminated.

The district court found that Roskovics' failure to remove or investigate the graffiti did not amount to legally actionable employment actions under a Title VII retaliation analysis, but was properly brought as a hostile work environment claim. *Id.* Moreover, Roskovics took action, informing employees on every shift that graffiti was unacceptable and instructing the supervisors to check for graffiti. *Id.*

The district court held that Norfolk Southern's work assignment policies did not result in actual harm or injury that affected her in a materially adverse manner. The court pointed out that Plaintiff never filed a grievance or complaint about working with Huffman or others prior to June 10, but chose to use vacation or personal days to avoid working with him or others or to avoid working the single position. ID# 1286-87. The court concluded that these alleged employment actions would not have dissuaded a reasonable employee, and did not deter Plaintiff, from filing complaints.

Thus, the "primary issue" before the court was whether Plaintiff's protected activity was the "but for" cause of her removal from service and eventual termination, and whether Plaintiff established that the proffered reasons for her removal and termination were pretext.

Plaintiff claimed a causal connection based on the temporal proximity between the June 10 meeting to discuss her EEOC complaints and her removal from service the next day, coupled with Roskovics's testimony that he was "upset" and "offended" that Plaintiff told the EEO

14

officer that he had not removed the original graffiti. The district court held that Plaintiff failed to establish a "but for" cause for her termination under a cat's paw theory of liability because Swany "did not simply take Roskovics' word for what happened." ID# 1289. The court found that "Swany undertook a comprehensive independent investigation" and that he was unaware of Plaintiff's prior protected activity before the hearing. He therefore could not have had a retaliatory intent. *Id.* Thus, "Plaintiff's EEO-related complaints were broken by the independent investigation and findings by Swany." The court noted that Roskovics may have "set the ball in motion for Plaintiff's termination by placing the call to his supervisor and the LRB," but that "Swany did not view the events of June 10 through Roskovics' eyes; rather he heard evidence from all parties involved and made an impartial decision. She did herself in." *Id.* Thus, Roskovics' animus was not the but-for cause of her termination. *Id.*

The district court considered pretext next. Even if Plaintiff could establish a prima facie case of retaliation, the court found that "her insubordination and unauthorized departure from the worksite" were legitimate, nondiscriminatory reasons for her termination. Plaintiff claimed that her meeting with Roskovics on June 10 established pretext because the parties disagreed as to what was said. The district court refused to treat this factual dispute as material to the issue of pretext:

> Plaintiff claims she asked to be "excused" and Roskovics said "yes." Roskovics denied that Plaintiff asked if she could be excused. While this Court must draw all inferences in favor of the non-moving party, it is not required to draw unreasonable inferences. In the context of the conversation that had just occurred between Roskovics and Plaintiff, it is not a reasonable inference that Roskovics was giving Plaintiff permission to leave work for the day. The undisputed evidence is that Roskovics had just told Plaintiff that he was not going to change her work assignment for the day; it stretches logic that Roskovics would then turn on a dime and decide that although he was not going to change her work assignment, he would send Plaintiff home. Why would he? And who would work the assignment now that the shift had started? In other words,

15

> Plaintiff's understanding of the conversation she testified she had with Roskovics is neither reasonable nor plausible. Plaintiff conceded this Court is not required to view the alleged conversation in isolation, but should be viewed in the context of the events of that day and before.

ID# 1290-91 (internal citations omitted).

The court also held that Defendants had an honest belief that their actions were appropriate given Plaintiff's conduct. ID# 1291. The court concluded despite some discrepancies, "Plaintiff's string of allegations" did not change "the pivotal issue—why she was fired—and the clear answer—because she abandoned her job. She left in a huff." ID# 1291. Finally, the court noted that its decision was consistent with state administrative, company, and union reviews. ID# 1291.

## II. Legal Standards

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Bowling Green v. Martin Land Dev. Co.*, 561 F.3d 556, 558 (6th Cir. 2009). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251– 52). All reasonable inferences must be drawn in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## B. Title VII[6]

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 59 (2006) (quoting § 2000e–3(a)). "[U]nlike the substantive provision, [the antiretaliation provision] is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. The "opposition" clause protects the filing of formal discrimination charges with the EEOC, as well as complaints to management, and less formal protests of discrimination. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). Thus, we consider both Plaintiff's filings with the EEOC and her internal complaints to Norfolk Southern management as protected activities under Title VII. Id. "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington*, 548 U.S. at 67.

Plaintiff offers only circumstantial evidence to support her retaliation claim. We therefore employ the *McDonnell Douglas* burden-shifting framework. Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation. *Laster*, 746 F.3d at 730. If the plaintiff succeeds in making out the elements of a prima facie case, the burden of production shifts to the employer to articulate some legitimate, non-discriminatory reason for its actions. If the defendant satisfies its burden of production, the burden shifts back to the plaintiff to demonstrate that the defendants' proffered reason was not the true reason for the employment decision. *Id.* Although the burden of production shifts between the parties, the burden of persuasion remains on the plaintiff. *Id.*

---

[6] The Ohio Supreme Court has held that federal case law interpreting Title VII generally applies to Ohio Rev. Code § 4112. *Colston v. Cleveland Pub. Library*, 522 F. App'x 332, 336 (6th Cir. 2013) (quoting *Burch v. Cuyahoga Cty. Probate Ct.*, 880 N.E.3d 132, ¶ 20 ((Ohio Ct. App. 2007)).

17

To establish a prima facie case of retaliation under Title VII, the plaintiff must demonstrate that: (1) she engaged in activity protected by Title VII; (2) the defendants knew of her protected activity; (3) thereafter, the defendants took "materially adverse" actions against the plaintiff; and (4) the protected conduct was a but-for cause of the adverse action. *Id*; *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534-35 (2013).

The third element requires a plaintiff to show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal quotation marks and citations omitted). The test is an objective one. *Id.* However, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." *Id.* Moreover, although not dispositive, "the fact that an employee continues to be undeterred in his or her pursuit of a remedy . . . may shed light as to whether the actions are sufficiently material and adverse to be actionable." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008). *But see Steel v. Schafer*, 535 F.3d 689, 696 (D.C. Cir. 2008) (stating that the "materially adverse" standard does not require consideration of "the courage that particular employee demonstrated by reporting it (and hence of her asserted imperviousness to acts of retaliation)").

The fourth element requires the plaintiff to prove that "'the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.'" *Laster*, 746 F.3d at 731 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ---, 133 S. Ct. 2517, 2533 (2013)). In other words, "Title VII retaliation claims must be proved according to traditional principles of but-for causation." *Nassar*, 133 S. Ct. at 2533.

18

The burden of proving a prima facie case in retaliation cases is "not onerous." *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013).

### III. Analysis

Plaintiff presents three main issues on appeal. First, she claims that the district court erred in finding that she had not been subjected to retaliation prior to her removal from service, and that her removal from service and termination was the culmination of a demonstrated history of retaliation. Second, Plaintiff contends that there is a fact question as to whether her removal from service and termination were causally related to her history of engaging in protected activity. Third, she claims she established pretext. Relatedly, she contends that the district court misapplied the "cat's paw" doctrine and the "honest belief" defense.

Only the third and fourth elements of the prima facie case of retaliation are at issue.

### A. Materially Adverse Actions

Plaintiff's primary claim in this case is retaliatory discharge, which is obviously a materially adverse action (as well as an adverse employment action that affects the terms and conditions of employment). The question is whether Plaintiff's secondary claims constituted materially adverse employment actions.

We agree with the district court that none of the secondary claims satisfy the third element of her prima facie case. Roskovics' report was not a materially adverse action. It is uncontroverted that regardless of whether the anglecock was closed or open, Roskovics investigated but was unable to determine whether it was done for a legitimate reason or sabotage. Roskovics' lie to management, which was not discovered until after Roskovics' deposition in 2012, could not have dissuaded Plaintiff or a reasonable employee from exercising her Title VII

rights. Roskovics' alleged failure to remove or investigate anonymous graffiti ignores the fact that Roskovics took some action – namely that he told all employees that further graffiti would not be tolerated and directed the supervisors to visit the caboose daily and paint over any new graffiti. Yet Plaintiff followed up with Roskovics only once, a week or two after her initial complaint, and did not complain about the allegedly inadequate response for another six months, until the new graffiti appeared in June 2010, so Roskovics "inaction" cannot be deemed adverse.

Roskovics' refusal to exercise his discretion to modify the job assignment was also not an adverse action. Plaintiff offers nothing to show that the assigned position—the single position—as considerably worse than the job she desired. *Cf. Burlington*, 548 U.S. at 71 (holding that whether a reassignment of job duties within the same job description is materially adverse depends upon the circumstances of the particular case). In fact, Plaintiff testified that she preferred the tying position because it allowed for more exercise than the single position. It is undisputed that the alleged train sabotage occurred and the graffiti appeared when Plaintiff was assigned the tying position, undermining her argument that Roskovics was retaliating against her by not giving her the allegedly "safer" tying position assignment. Moreover, the assignment was on a rotation; all of the other members of the second shift yard crew also had to work the single position. At most, Plaintiff offers her testimony that she feared or did not like certain coworkers; but this is not the type of conduct Title VII is designed to redress. *See Burlington*, 548 U.S. at 68 ("Title VII, we have said, does not set forth 'a general civility code for the American workplace.'" (quoting *Oncale v. Sundowner Offshore Servs, Inc.*, 523 U.S. 75, 80 (1998)).

In short, we agree with the district court's conclusion that none of these events constituted materially adverse actions, individually or in the aggregate.

## B. Causation

Plaintiff has met her burden of establishing causation as to the removal from service and termination. Construing the evidence in the light most favorable to Plaintiff, it is clear that she has raised an inference of causation given the temporal proximity between her protected activity on June 7 and June 10, 2010, and her removal from service on June 11, and her termination in August. *See Taylor*, 703 F.3d at 339 (holding that "if there is a very close temporal proximity, then no other evidence is needed"); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation."). Roskovics' admitted anger at her for accusing him of lying is additional evidence of that retaliatory motive.

Plaintiff has not met her burden as to her secondary claims, however. Plaintiff makes no attempt in her appellate briefs to establish a but-for causal connection between her protected activities and these alleged materially adverse actions, other than to relate them to her ultimate termination of employment. "It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Benge v. Johnson*, 474 F.3d 236, 245 (6th Cir. 2007) (alteration, quotation marks, and citation omitted)). *See also Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 558 (6th Cir. 2008) (holding that the plaintiff waived argument that her employer terminated her in violation of the Tennessee Public Protection Act where she failed to cite either the statute or to develop argument with specificity in her appellate brief). Thus, even if her secondary claims had merit, her prima facie case of retaliation as to these claims fails as a matter of law.

21

## C. Pretext

The district court held Plaintiff's insubordination and unauthorized departure from the worksite were legitimate, non-retaliatory reasons for her termination. Plaintiff counters that Defendants actually terminated her employment because of her EEOC charges and complaints to management. To establish pretext a plaintiff must demonstrate that the proffered reason was (1) factually false, (2) did not actually motivate the discharge, or (3) was insufficient to warrant the discharge. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), *as recognized in Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009).

Plaintiff proceeds under the second method, arguing that Swany's decision was actually motivated by Roskovics' retaliatory animus towards her. In other words, Plaintiff claims that Swany acted as Roskovics' "cat's paw." Assuming for sake of argument that the cat's paw causation standard would apply to Title VII retaliation claims,[7] we nonetheless hold that because

---

[7] In *Sims v. MVM, Inc.*, 704 F.3d 1327 (11th Cir. 2013), the Eleventh Circuit held that the proximate causation standard for cat's paw liability in the Uniformed Services Employment and Reemployment Act (USERRA) cases did not apply to cat's paw cases involving age discrimination under the ADEA. *Id.* at 1336. In *Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011), which involved the USERRA, the Supreme Court held that an employer could be held liable for a subordinate supervisor's discriminatory animus or cat's paw if the subordinate supervisor performs an act motivated by antimilitary animus that is intended to cause an adverse employment action, and that act is a proximate cause of the ultimate employment action. *Staub*, 131 S. Ct. at 1194. The Eleventh Circuit reasoned that:

> [T]he text of the USERRA and the ADEA differ in important respects. The USERRA (and Title VII) requires that a plaintiff demonstrate discrimination by showing that the proscribed bias was a "motivating factor" in the adverse decision. 38 U.S.C. § 4311(c) (USERRA); 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B) (Title VII). As the Court in *Staub* emphasized, this "motivating factor" causation standard is simply the traditional tort law standard of proximate cause, requiring only "some direct relation between the injury asserted and the injurious conduct alleged, and excludes only those link[s] that are too remote, purely contingent, or indirect." 131 S.Ct. at 1192 (internal quotation marks omitted). By contrast, the ADEA states that it is unlawful if an employee suffers adverse employment action "because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). Thus, "to establish a disparate-treatment claim under the plain language of the ADEA, ... a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross*, 557 U.S. at 176, 129 S.Ct. at 2350. As noted above, a "but-for" cause requires a closer link than mere proximate causation; it requires that the proscribed animus have a determinative influence on the employer's adverse decision. *Id.*

22

Plaintiff cannot show that Roskovics' alleged retaliatory motive was *a* motivating factor in Swany's decision to terminate her, Plaintiff has not established that retaliatory animus was the *but-for* cause of her termination.

"When an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, this Court has held that the employer may be held liable under a 'rubber-stamp' or 'cat's paw' theory of liability." *Bishop*, 529 F. App'x at 696 (6th Cir. 2013) (citing, *inter alia*, *Staub v. Proctor Hosp.*, 131 S. Ct. 1186 (2011)). To prevail on this theory, a plaintiff must show that the decisionmaker relied on discriminatory information from the biased supervisor. *Id.* If the ultimate decision was based on an independent investigation and the plaintiff cannot establish that the supervisor's discriminatory animus influenced the decision, there is no causal connection. *Id. See also Staub*,

---

As the Supreme Court cautions, "we 'must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination.'" *Id.* at 174, 129 S.Ct. at 2349 (quoting *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 393, 128 S.Ct. 1147, 1153, 170 L.Ed.2d 10 (2008)). And the ADEA requires more than what must ordinarily be proven under an analogous Title VII or USERRA action. *See Simmons v. Sykes Enters., Inc.*, 647 F.3d 943, 949–50 (10th Cir.2011) ( "If we were to apply *Staub* directly to an age-discrimination case, the plaintiff would then only need to prove her supervisor's animus was somehow related to the termination and not that the animus was necessary to bring about the termination."). Because the ADEA requires a "but-for" link between the discriminatory animus and the adverse employment action as opposed to showing that the animus was a "motivating factor" in the adverse employment decision, we hold that *Staub's* "proximate causation" standard does not apply to cat's paw cases involving age discrimination. In so holding, we follow the same holding by the Tenth Circuit in *Simmons*, 647 F.3d at 949–50.

*Sims*, 704 F3d at 1335-36.

In *Nassar*, the Supreme Court held that since Title VII's antiretaliation provision, § 2000e-3(a), contains the same "because" language as the ADEA, Title VII retaliation claims likewise require proof that the desire to retaliate was the but-for cause of the challenged employment action. *Nassar*, 133 S. Ct. at 2528. Thus, it would appear that, at a minimum, the cat's paw theory of liability must be modified in Title VII retaliation cases. *See Bishop v. Ohio Dep't of Rehab. & Corrs.*, 529 F. App'x 685, 699-700 (6th Cir. 2013) (McKeague, J., dissenting) (stating that *Nassar*'s holding that Title VII retaliation claims must be proved according to traditional principles of but-for causation applied to the cat's paw scenario *sub judice*, requiring the plaintiffs to show that the supervisor's wrongful actions were the but-for cause of their termination in a case brought under 42 U.S.C. § 2000e-3(a)).

23

131 S. Ct. at 1193. If the wrongful actions were merely a motivating factor in the termination decision, the claim fails as a matter of law. *Id.*

Plaintiff asserts that a reasonable jury could find that Roskovics intended to cause an adverse employment action when he removed her from service and instituted disciplinary proceedings. While Roskovics may not have had independent authority to terminate Plaintiff, he was the General Foreman of the Bellevue facility and clearly had the authority to remove an employee from service and institute disciplinary proceedings, and that "[t]his role gave him significant input over Swany's determination." Appellant's Br. at 49. Plaintiff further claims that Roskovics' description of the events of June 10, 2010 played a significant role in Swany's determination. She claims that a reasonable jury could find that there was no insubordination because she had permission to leave work. She asserts that the district court usurped the jury's role to determine what was said and meant in concluding that "Plaintiff's understanding of the conversation she testified she had with Roskovics is neither reasonable nor plausible" and in making the ultimate fact finding that Plaintiff "did herself in."

The district court correctly rejected Plaintiff's argument. To begin with, the decision to remove Plaintiff from service was not made by Roskovics, but by Price, of the labor relations department. The decision to terminate Plaintiff was made by Swany. The record establishes that Swany did not receive any information about Plaintiff's employment history and protected activity prior to the hearing. Swany did not speak with Roskovics or review any reports prepared by him before the hearing. Roskovics' testimony at the hearing addressed exclusively the events of June 10, 2010. Moreover, with the exception of whether she asked to be excused, Roskovics' testimony was largely consistent with Plaintiff's version of events (as well as the testimony of

the other witnesses). In short, Plaintiff offered no proof that Roskovics' alleged retaliatory animus towards Plaintiff had any impact on Swany's decision-making process.

More importantly, Plaintiff admitted to the conduct that formed the basis of her dismissal. Plaintiff testified that she told Davis she shouldn't have to work the single position, protested to Roskovics, and left the job site. She did not testify that she asked Roskovics permission to go home. Thus, her decision to leave the work place was based on her subjective belief that she received permission to leave the premises for the evening, not something Roskovics expressly said. Plaintiff's admissions establish that Swany's decision was not improper based on the facts before him—that Plaintiff expressed reluctance if not outright refusal to work the tie position and left the job site based on her subjective belief rather than express permission from Roskovics.

In other words, Plaintiff's own testimony undermines any suggestion that Roskovics' description of the events of June 10, 2010 was somehow tainted by his "hidden agenda" to retaliate against Plaintiff for her protected activities.

Therefore, Swany's independent investigation was "in actuality, independent," because Swany did not take into account any allegedly biased report by Roskovics. *Cf. Chattman v. Toho Tenax Am, Inc.*, 686 F.3d 339, 352 (6th Cir. 2012) (noting in a Title VII status-based discrimination case that "if the intermediate supervisor makes a biased report to the ultimate decisionmaker, it may be a causal factor in the adverse action if the independent investigation by the employer 'takes it into account when determining that the adverse action was, apart from the supervisor's recommendation, entirely justified' . . . and then the investigation was not, in actuality, independent") (quoting *Staub*, 131 S. Ct. at 1193). "[W]hen a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's

25

retaliatory animosity and the adverse action is severed." *Roberts v. Principi*, 283 F. App'x 325, 333 (6th Cir. 2008). *Cf. Bishop*, 529 F. App'x at 697-99 (finding fact question because there was no evidence that the ultimate decisionmaker conducted any independent investigation but simply relied on the supervisor's retaliatory bias).

Under these circumstances, the district court correctly held that the cat's paw theory does not apply here. *Cf. Davis v. Omni-Care, Inc.* 482 F. App'x 102, 109-10 (6th Cir. 2012) (per curiam) (finding no cat's paw where the plaintiff admitted that he engaged in the misconduct for which he was discharged).

Plaintiff also argues that the proceeding was not independent because (1) Swany was a Norfolk Southern management official and not a neutral arbitrator, and (2) the hearing was not thorough because Swany cut her off when she attempted to bring up matters pertaining to her EEO and EEOC complaints. Plaintiff provides no authority for the implied proposition that an employer must engage a neutral arbitrator to conduct an investigation, and no facts to demonstrate that Swany was in fact biased. Furthermore, she did tell Swany that she felt her removal from service and termination were "in direct retaliation for me complaining about the graffiti." ID# 203-04. Given that Roskovics' testimony was limited to the evening in question, was consistent with the story told by all of the other witnesses, and basically consistent with Plaintiff's version of events (with the exception of one purported question), Swany did not act improperly in limiting her testimony to the events of June 10th.

Plaintiff further suggests that the disputed conversation between Roskovics and Plaintiff created a factual question as to whether Defendants' stated reason for her discharge was factually

26

false. *See Manzer*, 29 F.3d at 1084. As stated above, that factual disagreement is not material because Plaintiff admitted to the conduct that formed the basis of her dismissal.

In sum, accepting Plaintiff's allegations as true, the fact remains that she abandoned the job site based on her subjective, not objective, belief that Roskovics gave her permission to leave work. Nothing in the record establishes that Swany was influenced by Roskovics' alleged retaliatory animus for Plaintiff.[8]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[8] Given this conclusion, we find it unnecessary to address Plaintiff's "honest belief" argument.

HELENE N. WHITE, Circuit Judge, Concurring.

I.

I write separately to note that "Plaintiff's burden of establishing a materially adverse employment action is 'less onerous in the retaliation context than in the anti-discrimination context.'" *Laster v. City of Kalamazoo*, 746 F.3d 714,731 (6th Cir. 2014) (citing *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 67–71 (2006)). This court recently explained:

> In analyzing the significance of any given act of retaliation, "[c]ontext matters. 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.'" [*Burlington*, 548 U.S. at 69] (quoting [*Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81–82 (1998)]).
>
> *Laster*, 746 F.3d at 731.

Goodsite claims that after she filed her sabotage report and after she complained about the graffiti, it was not painted over and Roskovics conducted no investigation. Goodsite followed up with Roskovics once after her initial complaint and complained again when new graffiti appeared six months later. Although defendants argue that Goodsite only made limited complaints, the fact that Roskovics' inaction may have dissuaded Goodsite from following up with him does not show that his actions were not materially adverse or that her complaints did not lead to retaliatory animus. Further, Goodsite asserts that Roskovics' refusal to accommodate her reassignment request, which he had previously been willing to do, was in retaliation for her complaints regarding the graffiti. I conclude that this was an adverse employment action. I nevertheless concur because I agree with the district court's conclusion that Goodsite cannot establish that the proffered reason for her discharge was pretextual.

28

## II.

I also note that the mere fact of Swany's independent investigation is not sufficient to insulate defendants from liability. In this regard, the majority's reliance upon *Roberts v. Principi*, 283, F. App'x 324, 333 (6th Cir. 2008), is misplaced. That unpublished decision was decided prior to the Supreme Court's decision in *Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1193 (2011), and its holding that a decisionmaker's independent investigation severs any causal link between the subordinate's retaliatory animosity and the adverse action is no longer applicable. I concur in the affirmance on the basis that Goodsite failed to establish that her discharge was in retaliation for protected activity. Goodsite asserts that Roskovics was the "cat's paw" whose retaliatory animus motivated her discharge, but Goodsite cannot establish that Roskovics proximately caused her termination because Swany's decision was the result of an undisputed event. Goodsite testified to the conduct that formed the basis of her dismissal, including that she did not ask Roskovics for permission to go home and that she did not tell Roskovics or any other supervisor that she was leaving the property. Thus, although the independent investigation included facts provided by Roskovics, Swany did not become a "conduit of prejudiced information" because substantially the same information was provided by Goodsite. *See Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 399, 350 (6th Cir. 2012); *Davis v. Omni-Care*, 482 F. App'x 102, 109–10 (6th Cir. 2011).